IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BEST DOCTORS, INC. | |
| Plaintiff, | DOCKET NO. 04 11330 RCL |
| | MAGISTRATE JUDGE _____ |
| v. | CIVIL ACTION |
| DONALD WEBSTER and | RECEIPT # 56582 |
| MULTIMEDIA CONSULTANTS, INC. | COMPLAINT AMOUNT $150 |
| | SUMMONS ISSUED ___ |
| Defendants. | LOCAL RULE 4.1 ___ |
| | WAIVER FORM ___ |
| | MCF ISSUED ___ |
| | BY DPTY. CLK. ___ |
| | DATE ___ |

Plaintiff Best Doctors, Inc. ("Best Doctors"), by its attorneys, BostonLaw Group, LLP, sets forth the following allegations in support of its Complaint:

## INTRODUCTION

1. This matter arises out of a series of illegal actions perpetrated by Donald Webster ("Webster"), a businessman and publisher, aided by two of his corporate vehicles, Multimedia Consultants, Inc. ("Multimedia") and Life Change Associates, Inc. ("Life Change").

2. In late February, 2004, Best Doctors filed suit against Life Change in the U.S. District Court for the District of Massachusetts (docket number 04-10398-RCL), alleging trademark infringement, trademark dilution, unfair trade practices, and related common-law claims. Life Change was infringing Best Doctors' federally-registered BEST DOCTORS trademark in two ways: Life Change was using the trademark in connection with providing physician directories on its Web site and in a magazine it published, and it also was placing the mark on commemorative plaques which it sold directly to physicians. Despite having full knowledge of Best Doctors' exclusive right to use the BEST DOCTORS mark in connection with these goods services, Life Change had repeatedly refused to cease and desist its infringement.

3. Life Change did not file an Answer or otherwise acknowledge the lawsuit; instead, it immediately filed for Chapter 7 bankruptcy protection, staying the pending litigation and delaying Best Doctors from obtaining the relief to which it is entitled.

4. After the bankruptcy filing, Webster immediately shifted his infringing activities to another of his corporations, Defendant Multimedia. Using the Multimedia entity, Webster has not only resumed, but indeed intensified, his infringement of Best Doctors' trademark rights.

5. Webster acknowledges that he and Multimedia are again using the BEST DOCTORS trademark in connection with physician directories published on Multimedia's Web site and in BetterLiving Magazine, as well as on commemorative plaques sold to physicians; Webster also boasts that he recently ordered a press run of 50,000 copies of BetterLiving Magazine, each one using the BEST DOCTORS trademark in connection with a physician directory, that he has sold between 200 and 300 commemorative plaques, each bearing the BEST DOCTORS trademark, at a cost of $149 apiece, and that as a result of these illegal activities, he expects Multimedia to receive revenues of approximately $500,000 this year.

6. In response to Plaintiff's warning that this Complaint would be filed against both Multimedia and him personally, Webster issued two threats: he said he would institute a second bankruptcy filing, this time for Multimedia Consultants, Inc., and that he would then move his personal operations out of state, presumably to form yet another corporation to continue his shell game of infringing activities.

7. Best Doctors now asks this Court to halt Webster's brazen defiance of the law by enjoining him and Multimedia from further infringement and by ordering them to compensate Plaintiff for the injuries it has suffered and which it continues to suffer.

## PARTIES

8. Plaintiff Best Doctors, Inc. is a Massachusetts corporation with its principal place of business at 101 Arch Street, Summer Exchange Building, Suite 500, Boston, MA 02110.

9. On information and belief, Defendant Donald Webster resides at 173 Kingsley Road, Burnt Hills, NY 12027.

10. On information and belief, Defendant Multimedia Consultants, Inc. is a New York corporation with its principal place of business at 333 Kingsley Road, Burnt Hills, NY 12027.

## JURISDICTION AND VENUE

11. This case arises under the trademark laws of the United States, 15 U.S.C. § 1051 et seq. The Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1338(a).

12. Plaintiff's state law unfair competition claim is joined with a substantial and related claim under the trademark laws of the United States, and, thus, the Court has jurisdiction over that claim pursuant to 28 U.S.C. § 1338(b).

13. Plaintiff's common law claims are closely related to its claim under the trademark laws and form part of the same case or controversy as those federal claims. The Court thus has jurisdiction over Plaintiff's common law claims pursuant to 28 U.S.C. § 1367.

14. The Court also possesses jurisdiction over this case due to the amount in controversy and the diverse citizenship of the parties, pursuant to 28 U.S.C. § 1332(a)(1).

15. A substantial part of the events giving rise to the claims described herein occurred in this District. Venue is thus proper in this District pursuant to 28 U.S.C. § 1391.

## FACTS

### The Business of Best Doctors, Inc.

16. The business of Plaintiff is to connect consumers suffering from serious illness or injury with outstanding medical care. Plaintiff performs this service by publishing physician directories and by providing physician-locator services, medical second opinions, referrals to expert specialists, care management and financial administration. The BEST DOCTORS services typically are provided as a benefit to programs of insurance, as an employee benefit, or as an individual or affinity membership program.

17. Plaintiff has had substantial success in promoting its brand and services on a global basis. Plaintiff's clients in the United States include Pepsi Bottling Company, Merrill Lynch, Aegon, Philip Morris, MetLife, American Reinsurance, and Blue Shield, as well as numerous other insurers, affinity groups, and thousands of individual subscribers.

18. Internationally, Plaintiff provides its services to approximately 150 clients, including major international insurers and re-insurers, banks, employers, and governments in the following countries: Canada, the United Kingdom, Ireland, Italy, Spain, France, Portugal, Belgium, Greece, Austria, Germany, Kuwait, the United Arab Emirates, Saudi Arabia, Japan, Venezuela, Colombia, Ecuador, Peru, Chile, Argentina, Brazil, Uruguay, Mexico, El Salvador and the Dominican Republic. These clients include AIG, Aon, BUPA, Canada Life, General Electric, Manulife, Marsh & McLennan, Munich Re, Skandia, Transamerica, Unum, and Winterthur. Overall, Plaintiff's services are made available directly and through its clients to more than 8 million people worldwide.

19. In support of these clients and covered individuals, Plaintiff owns subsidiary companies and/or maintains operational infrastructure in Argentina, Austria, Canada, Colombia,

Ecuador, France, Greece, Japan, Portugal, Spain, the United Arab Emirates, the United Kingdom, and Uruguay.

20.  Plaintiff has developed or initiated the development of a proprietary BEST DOCTORS database of physicians in each of the countries in which it has customers, as well as dozens of other countries around the world.

### Plaintiff's BEST DOCTORS Database

21.  Since 1992, Plaintiff and its predecessor have actively and continuously collected data from doctors to determine which doctors they consider to be the best in their field of practice. Every two years, Plaintiff undertakes a comprehensive poll of the approximately 30,000 physicians previously selected by Plaintiff, as well as approximately 10,000 additional physicians who meet specific criteria for voting.

22.  In the polling process, Plaintiff sends out approximately 40,000 ballots to these physicians. The ballots are accompanied by a cover letter from Plaintiff that describes the process employed by Plaintiff in the compilation of the database and also provides examples of the extensive media coverage and acclaim received by Plaintiff and the BEST DOCTORS database in the period since the last poll.

23.  The letter asks the physicians surveyed to provide, on a strictly confidential basis, clinical-ability assessments of the physicians listed on the ballots. Plaintiff provides to each physician a set of standardized evaluation criteria, as well as the opportunity to provide specific commentary on individual physicians' clinical/research orientation, bedside manner, surgical skill, or other relevant criteria.

24.  Each ballot contains a list of physicians in the voter's specialty area. Each of the physicians appearing on the ballot has either been elected as a BEST DOCTORS physician in a

prior poll, or has been nominated for consideration in the current poll. Depending on the specialty area, a ballot may contain as few as two dozen names or more than one hundred names.

25. In the 2003-2004 polling cycle, Plaintiff has enjoyed a very high response rate from the physicians surveyed, capturing more than one million clinical ability assessments.

26. The raw data obtained through the poll is entered into proprietary polling software developed for the collection of the data on each ballot. Once the raw polling has been entered into polling software, the data is processed through automated analytical software that is proprietary to Plaintiff. The result of that analysis is then subjected to detailed analysis by specially-trained researchers.

27. Plaintiff's proprietary analytical software performs a number of operations, including providing an aggregate score for each physician that also takes into account, among other things, (a) the source of the votes received, (b) the number of votes received, (c) the geographical spread of the votes, (d) the nature and extent of comments received, (e) the comparative results for other physicians in the same specialty area and/or geographical factors in terms of each of the above criteria, and (f) other statistical factors.

28. The computerized analysis of the voting data yields a preliminary set of physicians who have met the initial criteria to be elected as BEST DOCTORS physicians. Plaintiff then purchases or otherwise accesses a variety of resources to determine whether the doctors appearing on the list have been subjected to any disciplinary action or malpractice litigation or other related matters. Any such issues are referred to Plaintiff's medical research team, which determines whether the facts of the case warrant an exclusion from the BEST DOCTORS database.

29. Plaintiff also purchases or otherwise accesses state licensing and certification data, and the research team analyzes the list of names to determine if the doctors meet the licensing and certification requirements of the jurisdictions in which they practice medicine.

30. The result of each step in the analysis is recorded in the physician's electronic record in the analytical software. The results of this analysis are compiled and then copied into Plaintiff's BEST DOCTORS database, which includes more than 30,000 doctors -- or about 5% of all doctors nationwide -- in 40 medical specialties and 430 medical subspecialties.

31. Criteria outside of those described above are not considered in the decision to include physicians in the BEST DOCTORS database. Inclusion in the BEST DOCTORS database cannot be purchased or otherwise obtained other than through this rigorous polling and analytical process.

32. At the end of the polling and analytical process, Plaintiff sends a letter to each of the physicians elected, informing them of their inclusion in the database. The letter prominently displays Plaintiff's trademarks, including the BEST DOCTORS mark. The letter asks each doctor to provide to Plaintiff additional detailed information about his/her practice, experience, education and other issues. Plaintiff's research staff collects this data via fax, phone calls, and e-mail. The result is a robust and unique set of information about each physician included in the database, including areas of sub-specialization, the areas of research the physician is involved in, recent publications, the types of procedures the physician has the most experience with, the diagnoses the physician considers him/herself to be most expert in, as well as other specific information about the physician's practice, including the amount of time he/she spends seeing patients, the languages spoken in the office, whether the doctor will receive new patients, and many other pieces of information.

33. Plaintiff makes commercial use of the information contained in its database in a variety of ways. For instance, in an effort to promote its business as well as those physicians who have been selected as BEST DOCTORS, Plaintiff periodically publishes directories of outstanding physicians organized according to geographic area and practice specialty. Plaintiff also regularly licenses excerpts of its BEST DOCTORS database to magazines and newspapers across the country that wish to report on outstanding local physicians. Pursuant to these license agreements, magazines and newspapers publish articles accompanied by excerpts from the BEST DOCTORS database for a particular region, specialty area or other criteria. The published articles prominently display Plaintiff's federally-registered trademarks, BEST DOCTORS and THE BEST DOCTORS IN AMERICA.

34. Plaintiff also operates a physician-locator service in connection with the BEST DOCTORS trademark. Typically, Plaintiff receives a request from a consumer to be referred to a physician specializing in diagnosing and/or treating a specific medical condition; Plaintiff then provides consumer with the names, contact information, and other details concerning suitable physicians and, in many cases, Plaintiff arranges directly with the physician for treatment of the consumer. Alternatively, consumers may purchase limited access to Plaintiff's BEST DOCTORS database in order to search themselves for qualified physicians.

### Plaintiff's Sale of Commemorative Plaques

35. Plaintiff has found that physicians elected as BEST DOCTORS physicians consider that selection to be an honor. Plaintiff has further found that many of the BEST DOCTORS physicians wish to note their election publicly to patients and others as a demonstration of their recognized expertise. The predecessor to Plaintiff began selling commemorative plaques to BEST DOCTORS physicians in 1995, and found that there was a

significant market for such plaques for display in the office or at home or elsewhere. Plaintiff has continued and expanded this practice.

36. Along with the letter Plaintiff sends to the physicians included in the database informing them of their selection, Plaintiff includes a short solicitation form. The form offers the physician the opportunity to purchase a personalized plaque that bears the physician's name in a decorative font, along with a statement that the physician has been selected by his peers as one of THE BEST DOCTORS IN AMERICA. The plaque displays Plaintiff's marks, THE BEST DOCTORS IN AMERICA and BEST DOCTORS: INFORMATION WHEN IT MATTERS MOST, together with Plaintiff's Star-and-Cross logo.

37. The price for each plaque is $200. Plaques are purchased by sending in an order form to Plaintiff with a check or credit card number, by calling over the phone, or via a secured internet site. After receiving an order, Plaintiff has the plaque custom-made by a specialized producer of plaques, assembles the finished order, and ships the plaque via express mail to the physician.

38. Plaintiff has generated approximately $600,000 in revenues from its sale of these plaques in connection with its most recent survey.

### Plaintiff's Protected Trademarks

39. Plaintiff maintains a very active effort in the U.S. and abroad to obtain registration of its trademarks and to protect those marks against infringement.

40. Plaintiff owns multiple U.S. registrations and pending applications for its BEST DOCTORS mark, alone and in combination with a logo and/or a slogan.

41. Plaintiff's THE BEST DOCTORS IN AMERICA mark was first registered in the United States Patent and Trademark Office (PTO) on the Supplemental Register in January,

1995, for use in connection with Plaintiff's printed directories of doctors and with Plaintiff's physician referral services (Reg. No. 1,876,131).

42. Plaintiff then received a registration on the Principal Register for its THE BEST DOCTORS IN AMERICA mark (Reg. No. 2,162,196), also for use in connection with printed directories of doctors and physician referral services, in June, 1998.

43. Plaintiff subsequently has received the following three registrations, all on the Principal Register, for its BEST DOCTORS mark:

> BEST DOCTORS, Reg. No. 2,218,424, for physician referral services (January, 1999);
>
> BEST DOCTORS and Star-in-Cross Logo, Reg. No. 2,638,047, for physician referral services, the provision of health care and health-related information, and consulting in the fields of health care and medicine (October, 2002);
>
> BEST DOCTORS: INFORMATION WHEN IT MATTERS MOST and Star-in-Cross Logo, Reg. No. 2,655,393, also for physician referral services, the provision of health care and health-related information, and consulting in the fields of health care and medicine (December, 2002).

44. Plaintiff also owns a pending federal trademark application (Serial No. 78/352,700) for BEST DOCTORS for use in connection with decorative plaques.

45. Plaintiff has also applied for registration of these trademarks in several foreign jurisdictions, including the European Union, Canada, Brazil, Chile, Japan, Saudi Arabia, and the United Arab Emirates.

**The Development, Recognition and Promotion of the BEST DOCTORS Trademark**

46. In 1992, Plaintiff's predecessor published the first edition of a hardcover volume entitled *The Best Doctors In America* for consumers' use in identifying and locating specialist physicians.

47. The development of BEST DOCTORS database has been accompanied by the development of a range of services related to the database that help people who are faced with a serious illness.

48. Beginning in the mid-1990s, the services of Plaintiff and the BEST DOCTORS database began to receive prominent media attention, including, for example, a *USA Today* cover story in October, 1997.

49. In 1998, Plaintiff was the subject of a highly-rated segment on the CBS program *60 Minutes*. In a lengthy segment, journalist Morley Safer provided an in-depth profile of the services provided by Plaintiff and the stories of individuals who had been helped by Plaintiff.

50. Plaintiff's services have also been featured on NBC's *The Today Show*, CNN *Headline News*, and in *The New York Times*, *The Los Angeles Times* and the *Wall Street Journal*.

51. The credibility and integrity of Plaintiff, the BEST DOCTORS trademark, and the BEST DOCTORS database are vital to the process by which the BEST DOCTORS database is compiled. As highlighted in the *60 Minutes* segment, Plaintiff is completely independent, and does not take fees from physicians or otherwise compensate physicians for participating in the polling process. Plaintiff believes it is the integrity of the process by which Plaintiff compiles its database that enables Plaintiff to enjoy such strong responses from physicians in each polling cycle.

52. Plaintiff promotes the BEST DOCTORS database and methodology by permitting media outlets across the country to license excerpts from the BEST DOCTORS database for inclusion in their publications. Typically, these publications wish to publish articles recognizing local physicians included in the BEST DOCTORS database. Each such media outlet enters into a written license agreement with Plaintiff.

53. The license agreement requires the publication to include a statement of trademark ownership along with the article and published excerpts. The statement reads:

> BEST DOCTORS, THE BEST DOCTORS IN AMERICA and the BEST DOCTORS logo are registered trademarks of Best Doctors, Inc. and are used under license.

54. The license agreement further requires the publication to ensure that where it references the trademarks BEST DOCTORS or THE BEST DOCTORS IN AMERICA, or the BEST DOCTORS logo, each mark must appear with trademark indicia indicating its registered status.

55. The license agreement also requires each publication to provide Plaintiff, free of charge, an advertisement of between one-quarter page and a full page that Plaintiff uses to promote the BEST DOCTORS brand.

56. Typically, the publication affords Plaintiff front-cover treatment, and in all cases the publication provides a detailed description of the BEST DOCTORS database and methodology, along with Plaintiff's trademark notices.

57. Plaintiff estimates that the total average circulation of the publications with which Plaintiff has entered into license agreements is approximately 2 million copies. Advertising rates for each magazine vary by location, but it is estimated that the combined value of (i) the advertising obtained in those publications, (ii) the prominent front-page treatment afforded by many of the publications to Plaintiff, (iii) the dozens of articles about Plaintiff and the BEST DOCTORS database printed in the publications, and (iv) the staff time dedicated to the promotion of the BEST DOCTORS brand through these license agreements, approaches $1 million in connection with the most recent survey.

58. Plaintiff's annual direct expenditures on trademark-related activities exceed $250,000. This includes legal fees in the United States and abroad, filing fees, overhead

expenses and an allocation for the staff time of Plaintiff's and its subsidiary entities and operations globally involved in compiling, reviewing, purchasing and distributing the information required for each filing, as well as tracking down potentially infringing activities in the 25 countries in which Plaintiff does business.

### Defendants' Unlawful Infringement of Plaintiff's Marks

59. Defendant Webster is the owner of a New York corporation, Life Change Associates, Inc.

60. Plaintiff Best Doctors had filed a lawsuit in U.S. District Court for the District of Massachusetts (docket number 04-10398 RCL) against Life Change in February, 2004. Plaintiff's complaint alleged claims for trademark infringement, trademark dilution, unfair competition, and related common-law claims.

61. Life Change promptly filed for Chapter 7 bankruptcy protection in March, 2004, staying the pending litigation.

62. Defendant Webster subsequently transferred the use of several of Life Change's assets to another corporation under his sole control, Defendant Multimedia Consultants, Inc. Those assets include Life Change's customer lists, its domain name registration and the computer code for Life Change's Web site at <betterlivingmagazine.com>, Life Change's telephone number and fax number, its post office box, and Life Change's rights to the trademark BETTERLIVING MAGAZINE.

63. Defendants are using Plaintiff's trademark BEST DOCTORS in connection with publishing a printed periodical called "BetterLiving Magazine," which contains directories of physicians organized according to geographic area and practice specialty.

64. Defendants also are using Plaintiff's BEST DOCTORS mark in conjunction with providing an on-line physician-locator service at <betterlivingmagazine.com>. *See* Exhibit A, copies of materials from Defendants' Web site.

65. Defendants also are producing and distributing to physicians commemorative plaques bearing Plaintiff's BEST DOCTORS trademark. Defendants also have acknowledged selling between 200 and 300 of such plaques at a price of $149 apiece. *See* Exhibit B, June 4, 2004 correspondence from Plaintiff's counsel to Defendant Webster.

66. Defendant Webster admits that Multimedia recently ordered a press run of 50,000 copies of BetterLiving Magazine, each one using the BEST DOCTORS trademark in connection with a physician directory.

67. Webster also admits that, as a result of these illegal activities, he expects Multimedia to receive revenues of approximately $500,000 this year.

68. In response to Plaintiff's warning that the instant Complaint would be filed against Multimedia and also against him personally, Webster issued two threats: he said he would institute a second bankruptcy filing, this time for Multimedia Consultants, Inc., and he also threatened to move his personal operations out of state, presumably to form yet another corporation to continue his shell game of infringing activities.

69. Defendants' Web site at <betterlivingmagazine.com> fails to state or otherwise indicate that Defendants are unaffiliated with Plaintiff.

70. On May 19, 2004, Plaintiff's counsel sent Webster and Multimedia a letter demanding that they cease and desist all use of Plaintiff's registered trademark BEST DOCTORS in connection with these goods and services.

71. Notwithstanding Plaintiff's request to cease and desist, Defendants have continued to engage in their unlawful conduct, despite having actual knowledge of Plaintiff's sale of similar goods and services, and of the registered status of Plaintiff's trademarks.

72. Actual confusion among consumers has occurred: on January 8, 2004, Plaintiff was contacted by a third party who had received materials from Life Change soliciting him to purchase a "'Best Doctors' 2004 plaque." The third party wrongly believed that the materials had originated from Plaintiff.

73. Unlike Plaintiff's practices with its BEST DOCTORS physician directories and database, Defendants charge physicians a fee in exchange for being listed as a BETTERLIVING'S BEST DOCTORS physician. Defendants do not perform any substantive review or quality control over such paid listings.

74. On information and belief, at all relevant times, Webster has possessed sole control over Multimedia and Life Change. At his direction, Multimedia uses the same office space, e-mail addresses, Web site, mailing address, telephone number, fax number, and post office box as was previously used by Life Change.

75. Defendants' conduct threatens to cause confusion among general consumers and among doctors selected by Plaintiff as BEST DOCTORS physicians, and also to interfere with Plaintiff's prospective customer relationships.

76. By offering its inferior goods and services in conjunction with Plaintiff's registered trademark, Defendants have both blurred and tarnished the high-quality image Plaintiff has spent millions of dollars to develop with physicians and the general public.

77. Defendants' conduct has created actual confusion and will continue to create a likelihood of confusion among those doctors selected by Plaintiff for inclusion in the BEST

DOCTORS database, and also among general consumers shopping for physician directories and physician-locator services. Defendants' conduct has harmed and will continue to harm Plaintiff's reputation and goodwill, and has caused the loss of sales and profits Plaintiff would have made but for Defendants' illegal acts.

78. Plaintiff brings this action under the Lanham Act and state law to recover, inter alia, treble damages, punitive damages, attorneys' fees, and an injunction prohibiting Defendants from continuing their illegal and infringing conduct.

## COUNT ONE
### (Trademark Infringement Under the Lanham Act, 15 U.S.C. § 1114)

79. The allegations set forth in paragraphs 1 through 78 are incorporated by reference.

80. Continuously and since at least as early as 1992, Plaintiff or its predecessor in interest has owned the trademarks BEST DOCTORS and THE BEST DOCTORS IN AMERICA, and subsequently has owned the marks BEST DOCTORS: INFORMATION WHEN IT MATTERS MOST and Star-in-Cross Logo.

81. As noted above, the trademarks BEST DOCTORS, THE BEST DOCTORS IN AMERICA, and BEST DOCTORS: INFORMATION WHEN IT MATTERS MOST and Star-in-Cross Logo, are registered with the U.S. Patent and Trademark Office on the Principal Register.

82. Continuously and since at least as early as March, 1992, Plaintiff or its predecessor has used the trademarks BEST DOCTORS and THE BEST DOCTORS IN AMERICA, and subsequently has used the mark BEST DOCTORS: INFORMATION WHEN IT MATTERS MOST and Star-and-Cross Logo, to identify its products and services and to distinguish them from those offered by others.

83. Plaintiff has prominently displayed its marks in connection with its physician database, on its Web site, in publications setting forth excerpts of its list of BEST DOCTORS physicians, and in materials promoting its BEST DOCTORS physician-referral service and decorative plaques. Plaintiff's marks are displayed in conjunction with the goods and services at issue here.

84. As a result of this lengthy and widespread use, Plaintiff's BEST DOCTORS, THE BEST DOCTORS IN AMERICA and BEST DOCTORS: INFORMATION WHEN IT MATTERS MOST and Star-in-Cross Logo marks have acquired secondary meaning and distinctiveness.

85. Defendants have infringed Plaintiff's marks in interstate commerce by selling and offering for sale goods and services highly similar to those offered for sale by Plaintiff, all while using the trademarks BEST DOCTORS, BETTERLIVING'S BEST DOCTORS, and BETTERLIVING'S BEST DOCTORS ONLINE to promote such goods and services. The use of these trademarks by Defendants is without permission or authorization of Plaintiff. Use of the phrases by Defendants has caused actual confusion and mistake and has deceived. Defendants' use of the phrases will continue to cause confusion and mistake and to deceive, as evidenced by:

(i) the identical nature and/or extreme similarity of Plaintiff's protected marks and Defendants' infringing marks;

(ii) the strength of Plaintiff's federally-registered marks;

(iii) the fact that actual confusion has resulted from Defendants' use of the infringing marks, and that an extremely high likelihood of further confusion exists; and